A07A1743. CORN v. THE STATE.
(660 SE2d 782)

ANDREWS, Presiding Judge.

Robbie L. Corn, convicted by a jury of trafficking in methamphetamine, appeals from the denial of his amended motion for new trial, contending that his trial counsel was ineffective and that the trial court erred in two evidentiary rulings.

Viewed with all inferences in favor of the jury's verdict, *Jackson v. Virginia,* 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979), the evidence was that, having recently been released from prison, Robbie L. Corn was staying with his stepfather, C. J. Patterson, in January 2002. Patterson owned the single-wide trailer where he resided with Corn's mother. The room in which Robbie Corn was staying had a sign in it with his name on it, but it also had a sign with his brother's name on it. The brother and his wife sometimes stayed in the room as well.

Patterson was on active probation, a condition of which was that he submit to random searches of his person, home, automobile, and place of business. Corn was on intensive probation as a result of his

---

2001 plea of guilty to two counts of theft by receiving stolen property and one count of possession of a firearm by a convicted felon as well as a 2002 plea to possession of methamphetamine. A special condition of his probation was that

> [p]robationer shall submit to a search of his . . . business, person, houses, papers, and/or effects as these terms of the Fourth Amendment to the United States Constitution and Article I, Section I, Paragraph XIII of the Georgia Constitution are defined by the Court, upon reasonable suspicion, any time of the night or day with or without a search warrant whenever requested to do so by a Probation/Surveillance Officer, or any city, county, or state law enforcement officer and specifically consents to the use of anything seized as evidence in any proceeding against him. . . .[1]

On January 20, 2002, Fannin County Probation Officer Clemmons, who was overseeing Patterson's probation, received information from two officers, Sheriff's Investigator Panter and Probation Officer Lasley, that there was probably some illegal drug activity going on at Patterson's home. Panter had received this information from an informant who indicated that Patterson had methamphetamine available and that Corn supplied Patterson.[2] As a result of this information concerning Patterson, Clemmons, Panter, Lasley, and Probation Officer Phillips went to Patterson's trailer around 10:15 that evening to see Patterson. Upon arriving, Phillips went to the door and knocked, and Corn answered the door. None of the officers had expected Corn to be there. Clemmons asked Corn if C. J. Patterson was there and Corn said "[n]o[,] he's not here, and I'd rather you not come in." Based on his previous experience with Patterson, Clemmons was aware that Patterson would hide from him if he had been drinking or illegal activity had been going on. Based on Patterson's waiver, Clemmons told Corn to step aside and the officers entered the trailer to look for Patterson. In the living room, the officers found a man, later identified as Harold Messer, passed out in a chair. As Clemmons headed down the hall to Patterson's bedroom, he heard a woman in the bathroom and asked Lasley, a female, to check on her.[3]

Phillips went to the right as he entered the trailer to help secure it and to check for Patterson. Seeing a room with the door shut,

---

[1] Patterson's waiver, with two minor grammatical differences, is identical to this.

[2] Panter did not tell the probation officers about Corn's involvement at this point.

[3] The woman was identified as Brandy Davenport, Corn's girlfriend. Although she was tried with Corn, the trial court directed a verdict in her favor.

Phillips asked Corn whose room it was and Corn said "[i]t's mine." Asked if anyone was in the room, Corn said "[n]o." Phillips entered the room and another man, Chris Mealer, nervous and surprised, jumped up off the bed. Told to put his hands up, Mealer kept bringing them down and his right hand slipped into his pocket. When told to put his hands back up, Mealer did, throwing a small bag behind the bed. Phillips then handcuffed Mealer and retrieved the bag, which contained a green leafy substance he believed was marijuana. Also, Phillips noticed a wad of money on the floor of the bedroom and found $800 in cash on Mealer.[4]

While the sweep of the trailer was going on, Panter stayed in the living room with Corn, whom he had investigated in 2000, resulting in the 2001 charges. Clemmons, having checked Patterson's bedroom without finding him, returned to the living room to find Lasley with Davenport and Phillips with Mealer in handcuffs. Also, Corn was angry and cursing Panter.

After securing the scene and all the individuals, although being of the opinion that they had a right to search the trailer and the individuals there under the circumstances, Clemmons and Panter stepped out onto the front porch to discuss their next steps. They preferred to wait for Patterson to conduct a full search. As they stepped outside, a car drove up with Patterson in the passenger seat. The car went on by Patterson's trailer and the officers went down the driveway and cut it off. Clemmons approached Patterson and saw that he had an open beer in his hands, a violation of his probation. Clemmons got Patterson out of the car, took his beer, and patted him down. He advised Patterson he would have to arrest him because of the beer and also told him he had information regarding other illegal activity occurring at the trailer. Clemmons told Patterson he wanted to search the trailer and Patterson said "[n]o problem. There's nothing at my trailer."

When the officers began to search the trailer, Corn objected to the search of his room. Upon searching the room, the officers found a trafficking amount of methamphetamine (more than 28 grams and less than 200 grams), two sets of electronic scales, a half pound of marijuana, and a zipper bag on the bed containing a syringe filled with an unidentified liquid. Also found near the methamphetamine was a wooden box containing a billfold. Corn's employee identification was in the billfold, along with a computer disc. The disc contained notations identified by Panter as a recipe for methamphetamine. Also

---

[4] Mealer was also known to Clemmons and was on probation. His probation special conditions also contained a Fourth Amendment waiver.

found in the bedroom were two notebooks containing cryptic entries identified by Panter as a method used by drug dealers to track their dealings.

Patterson was given a drug test following his arrest, which was positive for methamphetamine. Patterson said he used it on Friday before his arrest on Sunday and that Corn had given him the methamphetamine.

Evidence of a similar incident was also introduced. In 2000, Panter was assisting in the search pursuant to a search warrant of another individual's residence in Fannin County, and Corn was present. There, they found methamphetamine in a locked tool box in a bedroom. Corn had the key to the tool box in his pocket and his identification was found in the tool box.

Harold Messer, the man passed out in the chair in the living room, testified that he had come to visit Patterson and they had been drinking. At some point, he passed out and did not regain consciousness until the search was being conducted. One week prior, Messer had purchased a quarter of a gram of methamphetamine from Corn for $20. Messer acknowledged that he was also on probation for a 2001 conviction of possession of methamphetamine.

1. In his first enumeration of error, Corn contends that the jury was improperly influenced by evidence that Messer, who was originally charged along with Corn and Davenport, passed an unstipulated polygraph test by implicating Corn and that the trial court erred in denying his motion for new trial on this ground.[5]

Prior to trial, the State notified the trial court that Messer would be testifying to statements given by him during a polygraph examination. The State indicated it was not going to introduce the polygraph, only statements made by Messer to the polygrapher, repeated to the assistant district attorney the morning of trial, that he had purchased methamphetamine from Corn at the trailer within the week prior to his arrest. Upon Corn's objection, the trial court excluded evidence of the polygraph examination "[u]nless — again, unless you open the door."

During his cross-examination of Messer, defense counsel brought out the fact that he was on probation for possession of methamphetamine and had approximately three years left when he was arrested with Corn. Defense counsel then asked why Messer was in prison clothes if he was on probation, and Messer said it was because he had violated his probation by not reporting. Defense counsel then asked the following questions, receiving the following responses from Messer:

---

[5] The trial judge recused following sentencing and another judge heard the motion for new trial evidence, reviewed the transcripts, and ruled on the motion for new trial.

Q: You made a deal with the State in your case, did you not?
A: What do you mean, sir?
Q: Well, this case is not pending against you anymore[,] is it?
A: I don't know, sir.
Q: Okay. *But you agreed to testify against Robbie Corn, isn't that correct?*
A: Yes, sir.
Q: *And the case was placed on the dead docket, is that correct?*
A: I reckon sir, I don't know.
Q: *All right, and you were to come here and testify that within a week you bought methamphetamine from Robbie Corn, isn't that true?*
A: Yes, sir.
Q: *All right, by doing that you're saving yourself from a mandatory minimum of ten years sentence in prison, isn't that true?*
A: I reckon, sir.
Q: *And a two hundred thousand dollar fine, isn't that true?*
A: I reckon, I don't know.

(Emphasis supplied.)
In response, the State argued the defense had opened the door to allowing in the polygraph test

by leaving the impression that the deal with the State was based on his agreement to testify. That is not the case, it's part of it, but *the major reason for the dead docket was because he stipulated to a polygraph and passed it and it was on agreement that if he did do so then the case would be dead docketed.*

(Emphasis supplied.)
As noted by defense counsel, the statement regarding the sale by Corn was not part of the polygraph examination, but was made to the polygrapher following the test but before Messer knew the results of his polygraph.

Defense counsel acknowledged that the implication of Corn was made following the polygraph test. The Court then stated: "[b]ut the issue here is *whether or not you've made an issue that that's why they made a deal.* The deal was that he passed it, it wasn't his drugs. It was stipulated." (Emphasis supplied.)

Messer then testified that he and his counsel requested the polygraph examination and that "[t]he way I understood it, if I passed it I was free." Messer also stated that, following the test, he was asked about Corn and told the polygrapher that within the week he had

purchased methamphetamine from Corn. He was concerned because he was trying to pass the polygraph and needed to be truthful.

Our Supreme Court has held "that upon an express stipulation of the parties that they shall be admissible, *the results of a lie detector test shall be admissible as evidence* for the jury to attach to them whatever probative value they may find them to have." (Emphasis supplied.) *State v. Chambers*, 240 Ga. 76, 76-77 (239 SE2d 324) (1977). Further, the results may be admissible to explain an actor's conduct or motive when such is relevant to the issues on trial. *Morris v. State*, 264 Ga. 823, 824 (2) (452 SE2d 100) (1995).

Corn's argument that his motion for mistrial was improperly denied is premised partly on his contention that Messer was the only witness who provided evidence that Corn *sold* methamphetamine, which was necessary for a conviction of trafficking. That, however, was not the charge contained in the indictment nor is it the only method of proving trafficking. As stated in OCGA § 16-13-31 (e) (1), and charged in the indictment, one may be guilty of trafficking if he "knowingly . . . has possession of 28 grams or more of methamphetamine. . . ."

Further, it is clear from Corn's cross-examination that he was making the argument that Messer was falsely accusing him in order to benefit himself and that this false testimony was the basis of the deal which he made with the State. Therefore, Messer's motive for testifying was directly called into issue by Corn, and the State was properly allowed to rebut Corn's allegations with the true terms of the deal, even though that involved the results of a polygraph. See *Morris v. State*, supra; *Newberry v. State*, 260 Ga. 416, 418-419 (3) (395 SE2d 813) (1990); *Bantz v. Allstate Ins. Co.*, 263 Ga. App. 855 (1) (589 SE2d 621) (2003).[6]

2. In his second enumeration of error, Corn contends that his trial counsel was ineffective on the sole basis that he did not pursue the preliminary motion to suppress the evidence seized from the bedroom.

To prevail on a claim of ineffective assistance of counsel, it must be shown both that counsel's performance was deficient and that but for this deficiency, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). Failure to satisfy either prong of the *Strickland* standard is fatal to an ineffective assistance claim. *Brewer v. State*, 224 Ga. App.

---

[6] We note that the trial court also charged the jury that the polygrapher's opinion could only be used to indicate that at the time of the polygraph, the witness believed he was telling the truth. Further, the jury could disregard this evidence and was to decide what, if any, weight it would be given.

656, 657-658 (2) (481 SE2d 608) (1997). "The trial court's determination with respect to effective assistance of counsel will be affirmed unless the trial court's findings are clearly erroneous. [Cit.]" *Chapman v. State*, 273 Ga. 348, 350 (2) (541 SE2d 634) (2001).

At the motion for new trial hearing, trial counsel testified that he did, as was his standard practice in drug cases, file numerous pretrial motions, including a preliminary motion to suppress. He was appointed to represent Corn in August 2002, and the trial was not until April 2004, and he discussed the case with Corn at length. The district attorney, as was the practice in this judicial circuit, had an open file policy and trial counsel fully reviewed the State's case and spoke to all the officers involved prior to trial. Having fully investigated the case, trial counsel concluded, based on the Fourth Amendment waivers of Patterson, Corn, and Messer, as well as the reasonable suspicion of improper activity at the Patterson residence possessed by the officers, that in his opinion, pursuit of the motion to suppress would have been a "fruitless argument."

First, we note that failure to file a motion to suppress is not ineffective assistance of counsel per se. *Roberts v. State*, 263 Ga. 807, 809 (2) (e) (439 SE2d 911) (1994). Also, Corn has failed to make the required "strong showing" that the evidence would have been suppressed had his trial counsel amended and pursued his preliminary motion to suppress.

Trial counsel's conclusion that such a motion would be fruitless was correct. *Peardon v. State*, 287 Ga. App. 158, 160 (651 SE2d 121) (2007) (Acceptance of special condition of probation regarding waiver of Fourth Amendment rights provided police with authority to search probationer, his vehicle, and his house pursuant to a tip.); see *Jones v. State*, 282 Ga. 784, 789-790 (1) (c) (653 SE2d 456) (2007) (Entering apartment without a warrant to arrest a probationer was permissible because the probation supervisor had, to his knowledge, reasonable cause for the arrest.); *State v. Cauley*, 282 Ga. App. 191, 194-195 (1) (638 SE2d 351) (2006).

Therefore, this enumeration is without merit.

3. Finally, Corn argues that the trial court erred in denying his motion for new trial based on evidentiary rulings made regarding the testimony of Chris Mealer, who was called as a defense witness.

Mealer waived indictment and pled guilty to trafficking methamphetamine prior to the indictment being returned against Corn, Davenport, and Messer. During that plea, he told the trial court under oath that he and Corn had known each other since high school and that they had been in the business of distributing drugs over the past year, five or ten times. He acknowledged that the drugs found in Corn's room in Patterson's trailer belonged to them jointly and were going to be distributed.

Prior to Corn's trial, however, Mealer decided to change his testimony and take the stand in Corn's behalf and claim all the drugs were his and his alone. Although the State argued that Mealer's prior statements implicating Corn in a pattern of sales over the years were admissible because the indictment charged the defendants as co-conspirators, the trial court initially ruled that only incidents occurring within the week prior to the search and Corn's arrest would be related to the conspiracy and allowed into evidence.

Mealer was the sole defense witness called and claimed that the drugs in Corn's room belonged to him and Corn knew nothing about them. He further denied any long-term relationship with Corn, saying only that he knew him as an acquaintance in tenth grade. At this point, over objection premised on the trial court's earlier ruling, the State was allowed to impeach Mealer based on his sworn testimony during his plea, including statements regarding prior drug dealings with Corn. Also, the State introduced as rebuttal evidence the testimony of GBI agent Cagle to whom Mealer also acknowledged prior drug dealings with Corn during an interview shortly after his arrest.

The admission of evidence is a matter within the sound discretion of the trial court, and material evidence does not become inadmissible because it incidentally places the defendant's character in issue. *Price v. State*, 269 Ga. 373, 374 (2) (497 SE2d 797) (1998). Evidence of membership in a gang is admissible to show a motive for a defendant's criminal conduct. *Mallory v. State*, 271 Ga. 150, 153 (6) (517 SE2d 780) (1999).

A witness may be impeached by contradictory statements previously made by him. OCGA § 24-9-83. Also, "[t]he state of a witness's feelings toward the parties and his relationship to them may always be proved for the consideration of the jury." OCGA § 24-9-68. There was no error in the trial court's allowing the State to go into Mealer's statements of his and Corn's prior drug dealings, even though the trial court initially ruled them inadmissible. *Borders v. State*, 285 Ga. App. 337, 340 (2) (646 SE2d 319) (2007); *Downing v. State*, 255 Ga. App. 225, 227 (564 SE2d 828) (2002).

*Judgment affirmed. Ellington, J., concurs. Adams, J., concurs in the judgment only.*

DECIDED MARCH 21, 2008 —
RECONSIDERATION DENIED APRIL 8, 2008 —

*Jimmonique R. S. Rodgers*, for appellant.

*Joe W. Hendricks, Jr., District Attorney, Clifford A. Sticher, Assistant District Attorney*, for appellee.